UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                      Plaintiff,<br>vs.<br><br>ENRIQUE IVAN ROCHA,<br><br>                      Defendant | Case No. 2:13-cr-00269-LDG-GWF<br><br>**FINDINGS & RECOMMENDATIONS**<br><br>**Motion to Dismiss for Outrageous Government Conduct (#32)** |

This matter is before the Court on Defendant's Motion to Dismiss for Outrageous Government Conduct (#32), filed on July 22, 2014. The Government filed its Response (#34) on August 4, 2014. Defendant filed his Reply (#35) on August 11, 2014. The Court conducted a hearing in this matter on August 21, 2014.

## BACKGROUND

Defendant Enrique Rocha is charged with using a facility of interstate commerce to knowingly persuade, induce, and entice, and to attempt to knowingly persuade, induce and entice an individual who has not attained the age of 18 years to engage in any sexual activity for which any person can be charged with a criminal offense under federal, state or local law, in violation of 18 U.S.C. § 2422(b). *Indictment (#1).* The indictment is based on the allegations set forth in the Application and Affidavit for Search Warrant prepared by Detective Wayne Nichols of the Henderson, Nevada Police Department on June 4, 2013. *Defendant's Motion (#32), Exhibit A.*

As part of his duties, Detective Nichols is assigned to investigate computer crimes, including crimes involving child sexual abuse, child pornography, and internet crimes against children. On May 22, 2013, Detective Nichols, posing as a fourteen year-old female, initiated

email contact with Defendant Rocha who had allegedly posted a "casual encounter" advertisement on Craigslist.com stating that he was looking to meet a female for sexual contact. The advertisement was titled "Looking for any type girl ASAP." The advertisement included the Defendant's telephone number and stated "that he was open to anyone." Detective Nichols stated: "Through training and experience, Craiglist has been a forum where adults are posting ads in hopes of initiating communication with juveniles." *Exhibit A*, pg. 00122. Detective Nichols states in his affidavit:

> On 5/22/13, I responded to the ad from an email account created strictly for the purpose of undercover operations as this one. The first email I sent was simply an introduction, asking if he was interested in someone a lot younger. Shortly later, the subject replied, asking how much younger if I had a picture.
>
> I then advised the subject that I was a 14 year old female. Throughout my communication with the subject my age was continuously cited both literally and in the theme of our communication. During the course of communication, the subject firmly acknowledged my age and continued to engage me in conversation, even sexual conversation at times.
>
> In regard to acknowledging my age, the subject's first response was his concern of me being "illegal" and his concern of being involved with a law enforcement operation. The subject also asked if I would be able to text. It was then that I provided him with my undercover cell phone number. After doing so, the subject stated that he was interested but wanted to speak with me on the phone -- adding he just wanted to hear my voice.

*Id.*, pg. 00122.

After additional text messages, Detective Nichols arranged to speak with the Defendant by telephone on May 22, 2013 using a voice modification device to make his voice sound like a juvenile female. Detective Nichols was unable to activate his external recording device, so there is no recording of the telephone conversation. *Id.,* pg. 00123. Detective Nichols described this telephone conversation as follows:

> The male subject answered and we communicated for approximately 7 minutes. During the phone call, the subject asked numerous times if I was really 14, to which I stated yes. He also stated his concern that he could be involved in a law enforcement operation. When asked of my name, I advised him my name was Samantha. He claimed his name was "Vans". The subject also asked if I would be able to text him, to which I expressed that was my preferred method

>of communication, citing my aunt and my fear that she would hear me communicating on the phone. Before hanging up, the subject made clear that he was interested and was going to text me.

*Exhibit A*, pg. 00123.

All subsequent communications between Detective Nichols, acting in the role of "Samantha," and Defendant occurred by electronic text communications.[1] Defendant requested a photograph of the female and Detective Nichols, in return, requested a photograph of the Defendant. Defendant sent photographs of himself to Detective Nichols by text message. Detective Nichols sent Defendant forensically regressed images of a female police officer to make her appear to be a fourteen year old female. *Id.*, pg. 00123.

Detective Nichols subsequently agreed to meet Defendant in the parking lot of a Subway Sandwich shop which "she" stated was near "her" residence. After Defendant did not appear at the initial rendevous on May 24, 2013, the two agreed to meet on the evening of May 25, 2013. Defendant sent a text message to Detective Nichols at 9:52 p.m. stating that he had arrived at the meeting location. Detective Nichols asked Defendant to send him a photograph to prove he was at the location. The Defendant did so. Through examination of the photograph and the digital data associated with the photograph, the police were able to determine that Defendant was at the intended meeting location. The Defendant also called Detective Nichols's undercover phone number several times during the time he stated he was at the meeting location. Detective Nichols responded to Defendant's text message by advising that he was unable to sneak out of his house. *Id.*, pg. 00126. The police subsequently obtained a search warrant for Defendant's residence. Defendant arrived home during the execution of the warrant. He was read his *Miranda* rights and agreed to speak to the police. Defendant allegedly admitted his participation in the foregoing conduct. *Id.*

Defendant moves to dismiss the indictment on the grounds that Detective Nichols engaged in outrageous conduct. Defendant argues that his initial Craigslist advertisement stated only that he

---

[1] A readable transcript of those communications has been filed by the Defendant. *See Supplement to Motion to Dismiss for Outrageous Government Conduct (#38), Exhibit I.*

3

was "[l]ooking for any type girl" and that it was Detective Nichols who implanted the idea of Defendant having sexual relations with a fourteen year-old female by posing as such in his undercover response to the advertisement. Defendant argues that Detective Nichols made statements and engaged in techniques that sought to overcome his reluctance, concern or inaction in regard to engaging in the proposed contact. The Government argues, however, that Defendant was made aware at the outset of the communications that the person he was communicating with was a fourteen years old female, and that Defendant made clear during the ensuing communications his desire and willingness to engage in sexual activity with the female, culminating in his overt act of going to the proposed meeting location.

## DISCUSSION

Dismissal of an indictment based on outrageous government conduct in violation of the Due Process Clause, requires a finding that the government's conduct was so grossly shocking and outrageous as to violate the universal sense of justice. *United States v. Hullaby*, 736 F.3d 1260, 1262 (9th Cir. 2013), citing *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991). *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) states that "[o]utrageous government conduct occurs when the actions of law enforcement officers or informants are 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.' *United States v. Russell*, 411 U.S. 423, 431-32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973)." *Black* further states:

> Dismissing an indictment for outrageous government conduct, however, is "limited to extreme cases" *in which the defendant can demonstrate* that the government's conduct "violates fundamental fairness" and is "so grossly shocking and so outrageous as to violate the universal sense of justice." [*United States v. Stinson*, 647 F.3d 1197, 1209 (9th Cir. 2011).] This is an "extremely high standard." *United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993) (quoting *United States v. Smith,* 924 F.2d 889, 897 (9th Cir. 1991) (internal quotation marks omitted). Indeed, there are only two reported decisions in which federal appellate courts have reversed convictions under this doctrine. *See United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978); *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971). *See also State v. Lively*, 130 Wash.2d 1, 921 P.2d 1035 (1996) (reversing drug conviction under state law, but relying on federal cases in finding outrageous government conduct.

733 F.3d at 302. (emphasis added).

Defendant Rocha argued at the hearing on this motion that *Black* shifts the burden of proof to the Government to show that it has not engaged in outrageous government conduct. Although not clearly articulated, Defendant's assertion is presumably based on the defendant making some threshold showing of improper government conduct which triggers the Government's burden. As the above passage indicates, however, nothing in *Black* supports Defendant's assertion. Early in the decision, *Black* also stated that "the defendants have not met the 'extremely high standard,' *United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993), of demonstrating that the facts underlying their arrest and prosecution are 'so extreme' as to 'violate[] fundamental fairness' or are 'so grossly shocking . . . as to violate the universal sense of justice,' *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011)." 733 F.3d at 298. It is clearly Defendant's burden to prove that Detective Nichols engaged in outrageous conduct that would justify the dismissal of the indictment on due process grounds.

*Black* states that "[t]here is no bright line dictating when law enforcement conduct crosses the line between acceptable and outrageous, 'so every case must be resolved on its own particular facts.'" *Id.* at 302, quoting *United States v. Bogart*, 783 F.2d 1428, 1438 (9th Cir. 1986), *vacated on other grounds sub nom*, and *United States v. Wingender*, 790 F.2d 802 (9th Cir. 1986) (order). The court noted that it has set forth certain ground rules that provide some guidance in evaluating motions to dismiss based on outrageous government conduct. For example, it is outrageous conduct for government agents to engineer and direct a criminal enterprise from start to finish. *Id.* citing *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008). It is outrageous for the government to use excessive physical or mental coercion to convince an individual to commit a crime. *Id.* citing *United States v. McClelland*, 72 F.3d 717, 721 (9th Cir. 1995). It is outrageous for the government to generate new crimes merely for the sake of pressing criminal charges. *Id.* citing *United States v. Emmert*, 829 F.2d 805, 812 (9th Cir. 1987). It is not outrageous, however, to infiltrate a criminal organization, to approach individuals who are already involved in or contemplating a criminal act, or to provide necessary items to a conspiracy. *Id.*, citing *United States v. So*, 755 F.2d 1350, 1353 (9th Cir. 1985). It is also not outrageous for the government to use "'artifice and stratagem to ferret out criminal activity.'" *Id.*, citing *Bogart*, 783 F.2d at 1438.

*Black* also noted that the court has identified certain factors (referred to as the *"Bonanno* factors" after *United States v. Bonnano*, 852 F.2d 434, 437-38 (9th Cir. 1988)) as relevant to the determination whether the government's conduct was outrageous. These include: (1) the known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue.[2] *Black*, 733 F.3d at 303. The court noted that these factors have not been used consistently or as a dispositive test. The court further stated: "Because we are to resolve every case on its own particular facts, we take account of the *Bonanno* factors in our analysis but only as part of our consideration of all the circumstances as a whole." *Id.*, at 304 n. 7. Consistent with *Black*, the district court in *United States v. Sapper*, 2013 WL 4857775, *2 (D.Nev. Sept. 10, 2013), held that the *Bonanno* factors are not a mandatory checklist, each element of which must be satisfied in order for the government's conduct to be considered proper. *Sapper* states that *"*[t]o read *Bonanno* as providing a five-part test that the government must satisfy would also impermissibly shift the burden to the government to demonstrate 'legitimate government activity.'" *Id.* 2013 WL 4857775, at *3.

The facts of this case are similar to those in *Sapper* in which the same detective posed as a fourteen year-old girl named "Vanessa" in responding to a Craiglist personal ad posted by the defendant which sought a sexual encounter with a female, but did not specify any desired age. As in this case, Detective Nichols responded to the ad by asking whether defendant would be interested in someone younger. The defendant responded affirmatively. During the ensuing exchange of emails or text messages, the defendant discussed engaging in sexual conduct with

---

[2] *Bonanno* stated that "[t]he government's conduct is permissible when: (1) the defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in progress at the time the government agent became involved; (2) the agent's participation was not necessary to enable the defendants to continue the criminal activity; (3) the agent used artifice and stratagem to ferret out criminal activity; (4) the agent infiltrated a criminal organization; and (5) the agent approached persons already contemplating or engaged in criminal activity." 852 F.2d at 437-38.

6

Vanessa who continuously indicated that she was fourteen years old. The defendant ultimately arranged to meet with Vanessa near a Subway sandwich store and was taken into custody after he arrived at the meeting location. *Sapper*, 2013 WL 4857775 at *7-8.

The district court in *Sapper* rejected the defendant's argument that it was improper for Detective Nichols to respond to the defendant's ad by posing as a fourteen-year-old female when there was no reason to suspect that the defendant was interested in pursuing sexual contact with an underage female. The court cited *United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993) and *United States v. Luttrell*, 889 F.2d 806, 812 (9th Cir. 1989) ("*Luttrell I*"), *rev'd en banc*, 923 F.2d 764 (9th Cir. 1991) ("*Luttrell II*") for the proposition that law enforcement agents are not required to have reasonable suspicion or "reasoned grounds" for investigating a particular individual for criminal activity. *Sapper*, 2013 WL 4857775, at *5, *9. The court also cited other cases in which courts have rejected the argument that an undercover officer acted outrageously or improperly by posing as an under-aged female in response to a Craigslist ad or in an internet chat room. *Id.* at *6, citing *United States v. Cruz*, 2013 WL 3833033 (E.D.Cal. Jul. 23, 2013) (denying motion to dismiss indictment for enticement of a minor where the defendant's initial Craigslist posting specifically requested "over 18" contact, defendant continued to pursue sexual relationship with the undercover responder he believed to be a 13-year-old girl, and defendant arranged to meet her at a fast-food restaurant where he was ultimately arrested); and *State v. Cunningham*, 808 N.E.2d 488, 492 (Ohio Ct.App. 2004) (officer posing as 14-year-old girl in an internet chat room did not engage in outrageous conduct where he merely gave the defendant the opportunity to solicit sex from a person who he believed was a fourteen-year-old minor).

Whether or not legally required, Detective Nichols had a reasonable investigative basis for responding to Defendant Rocha's ad in the guise of a fourteen year-old female. As stated in his affidavit, Detective Nichols was aware that Craigslist has been used as a forum where adults post ads in the hopes of initiating communications with juveniles. Defendant's ad stated that he was "Lookin for any type girl ASAP" and "that he was open to anyone." *Exhibit A*, pg. 00122. Although these statements did not necessarily indicate that he was seeking an underage female for sexual activity, they raised that possibility and provided a reasonable basis for Detective Nichols to

determine if Defendant would, in fact, pursue such illegal conduct. Defendant could have elected to terminate the communications once he was made aware that the person with whom he was communicating was only fourteen years old. Instead, Defendant allegedly continued with the communications, engaged in explicit discussions of hoped-for or anticipated sexual intercourse with the responder, and ultimately agreed to and proceeded to a rendevous location.

"The extent to which the government encouraged a defendant to participate in the charged conduct is important, with mere encouragement being of lesser concern than pressure or coercion." *United States v. Black*, 733 F.3d at 308, citing *United States v. Mayer*, 503 F.3d 740, 755 ("There is no evidence in the record that any coercive relationship existed between Mayer and [agent] Hamer."); *United States v. McClelland*, 72 F.3d 717, 721 (9th Cir. 1995) (rejecting outrageous conduct claim but noting that the government agent "did encourage McClelland at various times"); *Shaw v. Winters*, 796 F.2d 1124, 1125 (9th Cir. 1986) ("While there is no evidence that Shaw had dealt in food stamps before, once they were available he purchased them willingly and without pressure."). The text messages in this case show that it was the Defendant who initiated the discussion of having sex and who made explicit statements to the undercover officer about what would occur during the sexual encounter. *See e.g. Supplement (#38) Exhibit I*, pg. 371.

Defendant argues Detective Nichols pressured him to arrange a time for them to meet, and steered the discussion away from a mere titillating conversation about sex to a discussion of when they would meet to engage in sexual relations. The text communications do not support this interpretation. While the detective initially raised the question "so when does this go down and where?", *Id.,* pg. 372, Defendant promptly responded "Lol u tell me." *Id.* Defendant also asked the female for her address. *Id.*, pg. 373. Defendant's statements regarding sexual conduct were also made in the context of what would occur when they met, including a discussion of whether the female would perform oral sex and the use or non-use of condoms during intercourse. *Id.,* pg. 372-73. Defendant's statements also clearly indicated his desire to meet with the female while discussing the sexual activity that would occur. *Id.,* pg. 374. Defendant asserts that the detective chided or ridiculed him for not keeping their initially agreed-upon meeting on May 24, 2013 and cites this as evidence of improper pressure or coercion. *See Supplement to Motion to Dismiss*


*(#38), Exhibit I* (transcript of electronic text communications)*,* pg. 379.  The text communications on May 25, 2013 show, however, that after Defendant apologized for not keeping their earlier planned meeting, the detective stated: "its cool. but im not gonna get my hopes up 2 meet." Defendant promptly responded: "Well I'm at Buffalo Wild Wings and I wana **** babe I been thinking of you a lot." *Id.,* pg. 379.  From this exchange at 7:01 p.m., the Defendant and the detective exchanged communications until after 10:00 p.m to arrange to meet at a location near the female's house.  Once it was clear that Defendant had arrived at the meeting location, however, Detective Nichols told the Defendant that "she" could not sneak out of her house as planned because "her" aunt woke up.  *Id.,* pg. 379-381.

The record shows that Detective Nichols, in the role of Samantha, encouraged Defendant to believe that she would meet with him for sexual activity.  The record also shows that Detective Nichols made statements to counter Defendant's initial suspicion this might be a law enforcement operation, or that Samantha might not be a "real person."  Other than his concern about a possible law enforcement operation, Defendant did not express any reluctance about having illegal sexual relations with an under-aged female.  Nor did he demonstrate resistance to moving beyond a mere discussion about sex to arranging an actual meeting at which such activity would occur.  The Court therefore finds that Detective Nichols did not exert any undue pressure or coercion to induce Defendant into committing a criminal act.

The courts consider the various aspects of the government's participation in the offense conduct, including its duration and "the *nature* of the government's participation--whether the government acted as a partner in the criminal activity, or more as an observer of the defendant's criminal conduct--including any particularly offensive conduct taken by the officer during the course of the operation." *United States v. Black*, 733 F.3d at 308-09.  In this case, Detective Nichols, acting in the guise of an under-age female, participated in the proposed criminal activity by agreeing to engage in sex with the Defendant.  In this guise, Detective Nichols was also portraying the potential victim of the crime.  This is not the type of government participation in criminal activity that raises a significant issue of outrageous conduct.  *See e.g. United States v. Stenberg*, 803 F.2d 422, 430-31 (9th Cir. 1986) (noting that government agents' conduct in killing

wildlife as part of the undercover operation "raise[d] significant questions as to the extent to which government agents may commit serious crimes in order to prevent others from committing similar offenses"). Although not a precise match, Detective Nichols' conduct is more akin to the passive conduct of an undercover officer who agrees to purchase and receive illegal drugs or other contraband from a trafficker, which generally does not provide grounds for finding outrageous government conduct. *Id.*

The court also considers the need for the investigative technique in light of the challenges of investigating and prosecuting the type of crime being investigated. *United States v. Black*, 733 F.3d at 308-09. *Black* involved a "reverse sting" in which the undercover officers proposed the robbery of a fictional drug stash house. The court noted that "stash house robberies are largely unreported crimes that pose great risk of violence in residential communities. . . . The reverse sting tactic was designed to avoid these risks to the public and law enforcement officers by creating a controlled scenario that unfolds enough to capture persons willing to commit such an armed robbery without taking the final step of an actual home invasion." 733 F.3d at 309. The court recognized the legitimate purposes of such operations, but stated that because of the risks of law enforcement overreaching and ensnaring innocent individuals in criminal activity, the government does not have free license to forego reasonable alternative investigative techniques of identifying and targeting potential suspects before approaching them. *Id.* at 309-10.

It is in the nature of the subject crime that the victim agrees to participate in the prohibited sexual conduct. The victim is not legally competent to consent, however, and society has determined, through the enactment of criminal statutes, that he or she needs to be protected from his or her own harmful decisions. Illegal sexual encounters between adults and barely adolescent children also pose the risk of greater harm than the victims may have contemplated. Such crimes are also likely to go unreported by the victims because of their own lack of judgment or because of fear of punishment by their parents or guardians. Through sting operations such as those in this case and *Sapper*, law enforcement officers are able to identify and interdict perpetrators of such crimes before actual children are victimized. Where the internet site is one known by law enforcement to be used for such illicit contacts, and so long as the law enforcement agents do not

engage in undue enticement or coercion of innocent individuals, this type of law enforcement operation does not offend fundamental fairness and the universal sense of justice.

## CONCLUSION

Based on the facts and circumstances of this case, Detective Nichols did not engage in outrageous government conduct that justifies dismissal of the indictment on due process grounds. Accordingly,

## RECOMMENDATION

**IT IS RECOMMENDED** that Defendant's Motion to Dismiss for Outrageous Government Conduct (#32) be **denied**.

DATED this 5th day of September, 2014.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge